# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**CLEMENT FOGARTY,**                                  Chapter 7
    Debtor                        Case No. 08-10564

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**FAROUK YOUSSEF,**
    Plaintiff
v.                                                    Adv. P. No. 08-1112
**CLEMENT FOGARTY,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are the Amended Complaint filed by Farouk Youssef ("Youssef") against Clement Fogarty d/b/a/ Fogarty Construction ("Fogarty" or the "Debtor"). Pursuant to his Amended Complaint, Youssef seeks a determination that a debt owed to him by Fogarty arising out of a construction contract is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). The Court conducted a trial on December 9, 2009 at which time four witnesses testified, including Youssef and Fogarty,[1] and 14 exhibits were introduced into evidence.

---

[1] Fogarty testified at the Court's request for the limited purpose of clarifying his relationship with Ed Lavelle, the person who executed the construction contract with the Plaintiff on behalf of Fogarty Construction.

At the conclusion of the testimony presented by Youssef, counsel to the Debtor moved for a directed verdict. At the conclusion of the trial, the parties filed briefs. The issues presented include 1) whether the Plaintiff proved the elements of an exception to discharge under 11 U.S.C. § 523(a)(2)(A); and 2) whether a contract which is breached in so egregious a manner as to cause damage to property and emotional distress to the Plaintiff can support a claim for a willful and malicious injury to property under 11 U.S.C. § 523(a)(6). The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtor filed a voluntary Chapter 7 petition on January 28, 2008. On April 4, 2008, Youssef timely filed an adversary proceeding against the Fogarty to determine the dischargeability of a debt owed to him by Fogarty.

Youssef testified about his employment history. Trained as an architect in Egypt, Youssef is an experienced architect who has been employed by Stone & Webster or its successor for over 40 years. During his distinguished career, Youssef became "the principal architect for the whole company responsible for the corporation, managing all architectural work for the corporation through the years." Licensed as an architect in 26 states, Youssef has managed and supervised a vast array of projects, including the construction and renovation of residential, commercial and industrial buildings, such as the renovation of the American Embassy in Panama.

Youssef testified that he interviewed several contractors with respect to the

demolition of an existing house and the construction of a new, waterfront house located at 53 Edgewater Drive, Hull, Massachusetts (the "property"). The scope of the project was limited to ensuring that the building was "weather-tight," meaning that the house would be "framed, complete from the outside, including siding, windows, roof, [and] all interior partitions." Youssef explained that he intended to engage another contractor to do the finish carpentry and other work necessary to complete construction.

Youssef testified that he was "looking for a licensed contractor, somebody has certification [sic], has honesty and integrity to do the job I wanted to do." Fogarty was recommended to him by the owner of a construction company in Hingham, David Chase. Youssef met with Ed Lavelle ("Lavelle"), who gave Youssef the impression that he was a partner in Fogarty Construction, although, according to Fogarty, Lavelle was a "representative as far as getting work for me" and an authorized agent. Youssef ascertained that Lavelle was licensed, and he executed a contract with Fogarty Construction on February 24, 2006. The contract was executed by Lavelle, whose capacity as agent was not set forth on the signature line of the contract. Indeed, Youssef thought that Lavelle was a principal of Fogarty Construction. At the time he executed the contract, Youssef gave Lavelle a deposit in the sum of $15,000, which was cashed by Fogarty. According to Youssef, Lavelle represented the project would be finished in eight weeks and that he would be "doing the work himself as a knowledgeable person" and that Fogarty Construction had done similar jobs which had turned out well.

The contract executed between Youssef and Fogarty Construction is captioned

3

"Standard Form of Agreement Between Owner and Contractor for a Small Project (AIA

Document A105)." It provides that the "residence reconstruction" would be performed in

accordance with the "Contract Documents," including architectural drawings (sheets 1-26)

prepared by Youssef. Fogarty Construction was to commence work on March 1, 2006 or

the date of receipt of the construction permit and to complete work "on or before May 1,

2006 for a total contract price of $120,400. Payments were to be made according to the

following schedule:

| PORTION OF WORK | VALUE |
|---|---|
| Deposit | 15,000 |
| Demolition | 10,000 |
| Addition of concrete block 8" high | 2,000 |
| First floor deck complete | 18,000 |
| Second floor deck complete | 18,000 |
| Roof framing complete with plywood | 25,000 |
| All interior stud partitions | 10,000 |
| All windows and doors exterior installed | 3,000 |
| Roof shingles | 6,000 |
| All exterior siding, trim, & gutters | 13,400 |

The contract also contained the following pertinent provisions.

### 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

3.3.1 The Contractor shall supervise and direct the Work, using the
Contractor's best skill and attention. The Contractor shall be solely
responsible for and have control over construction means, methods,
techniques, sequences and procedures, and for coordinating all portions of
the Work.

4

3.3.2 The Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of subcontractors or suppliers for each portion of the Work. The Architect will promptly reply to the Contractor in writing if the Owner or the Architect, after due investigation, has reasonable objection to the subcontractors or suppliers listed.

*** 

3.5 WARRANTY

The Contractor warrants to the Owner and Architect that (1) materials and equipment furnished under the Contract will be new and of good quality unless otherwise required or permitted by the Contract Documents; (2) the Work will be free from defects not inherent in the quality required or permitted; and (3) the Work will conform to the requirements of the Contract Documents.

Youssef testified about the "empty promises," including ones set forth in the contract, about job completion in eight weeks, and the engagement and supervision of only licensed professionals, rather than unsupervised and unlicensed "kids."

Following execution of the contract, Fogarty Construction did nothing until the end of April when it began demolition on a Saturday. According to Youssef, due to complaints from neighbors and police and fire department personnel, as well as complaints from representatives of the Board of Health for the Town of Hull, he traveled to the demolition site. Youssef stated that he was not advised that the heavy equipment operator at the site was a subcontractor. Additionally, neither Lavelle nor Fogarty produced an insurance binder, but Youssef did not indicate when he asked for the binder.

According to Youssef,

5

> During demolition of the house, to start with, he was supposed to be
> demolishing the house up to the first floor level, street level; and the rest to
> be done by hand.  When I arrived at the house, the machine was already in
> the middle of the house.  And the reason for that, there was a foundation
> wall in the middle of the house which I wanted to maintain so I can do the
> framing on the top of it; but the machine, [sic] he said, "We'll demolish it,"
> Fogarty said "Demolish it.  Well, it's easier and faster."

Youssef added that because of the manner in which the machine operator was compacting

debris in the dumpster, the foundation wall of the house, which was not be disturbed,

buckled and collapsed.  Additionally, a wall on the waterside of the property was damaged

when the machine operator pulled the wall into the water.

Despite the numerous problems associated with the demolition process, Youssef

paid Fogarty Construction another $10,000.  He testified that he repeatedly called Fogarty

Construction to remove dirt and debris that was spilling into the street and violating the

order of conditions that he received from the Department of Environmental Protection, as

the house threatened to pollute the water.  Accordingly to Youssef, Fogarty ignored his

calls and did not return to the job site until the beginning of June, at a time when the

contract was to have been completed.

During the first and second week of June, Fogarty Construction began construction.

Youssef was out of town on business and when he returned he "found that all the stuff

they'd done is absolutely against the Code, against anything you know about

construction."  The workmen at the site were not performing the work in accordance with

the architectural drawings, and Fogarty was not present to supervise the  crew.  Youssef

discovered that David Ryan, who was working at the site and whom he believed was an

employee of Fogarty Construction, was actually a subcontractor.  According to Youssef, "he had no idea about construction, had no experience. . . ."

Youssef testified that he paid Fogarty Construction an additional $20,000 in June and subsequently paid an additional $18,000 on July 7, 2006 for a total of $63,000.  Youssef stated that when he made those payments, Fogarty represented that he would fix the mistakes and finish the job.

The agreed exhibits reveal that, on July 24, 2006, Youssef prepared a list of structural defects that had to be fixed "before additional loads [could] be added to the house." Youssef reasoned that he was "deep in the hole already with him [Fogarty], and that's why I was trying to see if things could be fixed, because it means delay, it means more pain for me, more try to get somebody else . . . ."  He testified that after he gave Fogarty the list, he never returned to the job site. Youssef testified:

> The house was wide open to deterioration for over two months.  The floors were sagging, the house is shaking.  And as a mater of fact  . . .  to this day . . . I am afraid that when we get hit with a big storm like the blizzard of '78 that the house would blow away. . . .

Youssef also testified that Fogarty never provided him with the name of subcontractors and suppliers in violation of contract provisions, and he testified that he relied upon the representations in the contract and that he suffered significant damages as a result. Youssef added that the stress associated with the demolition and Fogarty's lack of responsiveness to his telephone calls resulted in his hospitalization for chest pains.  He explained:

> I had no house, no place - - to stop at this point - - you know, I never believed

7

that, you know, I'll be one of the other statistics that you hear about about [sic] general contractor taking a person to the cleaners, especially when they felt, you know,  - - I had full trust in the person, I had full faith in them; and I thought, you know, maybe he had something else to do - - which I understand it could be delayed a week or two weeks - - and, you know, after all of this here - - I mean, a month went by, and already - - $25,000 already - - was - - and he's threatening me, "I cannot do the work unless I have the money now," you know, - - and I'm already under stress from the neighbors, from the town, from the police for - - and maybe also the  - - Mr.  - - Gary here can testify of the abuse we were getting from the neighbors because of the  - - they didn't want me to build the house. . . . So I was just dragged into a thing I could not get out - - was trapped.

Gary Stilphen ("Stilphen") of Stilphen Construction Company and Gilbert Baptista ("Baptista"), a civil engineer, also testified.  Stilphen indicated that he was a licensed contractor and that  he corrected deficiencies and completed the work at the property.  He testified as follows:

[W]e had to re-level the whole house best we could, what was there; and it was basically both upside down.  There was no foundation on any of it.  It was held up by whatever they had to hold it up with.  All the headers, all the door openings were all in the wrong place, wrong sizes.  Missing pieces everywhere, so basically they had no idea what they were doing.

He stated that the house had not been built in accordance with the applicable building code and that headers had to be removed.  In the basement, he was required to make structural changes because there were only a couple of posts - - two-by-fours and miscellaneous two-by-eight posts "here and there" holding up the house, the framing of which was not tied to the sill.  Indeed, the corners of the house were not tied together, the staircases were not built properly and had to be removed, and the plywood also was installed improperly in violation of the building code.

Baptista testified as an expert witness.  He indicated that he visited the job site

8

during construction.  He stated:

> I was astounded. The first thing I recognized was the fact that the
> construction of the house was being built above the first floor level with no -
> - no meaningful support on the main carrying beams. The two main carrying
> beams in the basement - - there was a hole chopped through  - - placed in the
> floor, and there was no footing in place. There were no columns in place. . .
> I've never seen anything like this before.  It was absolutely astonishing.

Baptista added that work of the type involved was required to be performed under the

direct supervision of a licensed contractor.  He noted missing columns, missing footings,

notched beams at the foundations "well beyond any reasonable person's understanding

of the transfer of loads,"[2] and structural deficiencies that an after-the-fact foundation could

not cure.  He added: "the most astonishing thing to me was work that I saw that was

ongoing . . .  was the fact that they were totally incompetent, that they were working on a

pier, and the work that they were doing showed me they had no comprehension of the

reinforcement material that they were putting in.  It was astonishing."


## III. DISCUSSION

A. Count I - - Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for

money, property, services, or an extension, renewal, or refinancing of credit, to the extent

---

[2] He explained that if "there is a notch taking away, in engineering terms, the
sheer force, the loads that get accumulated to the support point - - the material, the
strength of the material in the cross-section was totally removed to the  – at least three-
quarters of the material was removed so that the beam would not have the capacity to
transfer the shear of the foundation.  And that's a Code violation. . . ."

obtained, by-- (A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §

523(a)(2)(A). In Blacksmith Investments, LLC v. Woodford (In re Woodford), 403 B.R. 177

(Bankr. D. Mass. 2009), *aff'd*, 418 B.R. 644 (B.A.P. 1st Cir. 2009),  this Court stated:

> The United States Court of Appeals for the First Circuit has addressed issues
> under section 523(a)(2)(A) on multiple occasions, observing that, as with all
> exceptions to discharge under section 523(a), they are "narrowly construed
> . . . and the claimant must show that its claim comes squarely within an
> exception enumerated in Bankruptcy Code § 523(a)." McCrory v. Spigel (In
> re Spigel), 260 F.3d 27, 32 (1st Cir.2001)(citing Century 21 Balfour Real Estate
> v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)).  In Spigel, the First
> Circuit, while noting that the Supreme Court overruled its formulation of the
> reliance element of the test for nondischargeability under section
> 523(a)(2)(A), articulated the following requirements for establishing an
> exception to discharge under section 523(a)(2)(A):
>
>> [W]e have said that the statutory language does not "remotely
>> suggest that nondischargeability attaches to any claim other
>> than one which arises as a direct result of the debtor's
>> misrepresentations or malice." Century 21 Balfour Real Estate,
>> 16 F.3d at 10. Thus, in order to establish that a debt is
>> nondischargeable because obtained by "false pretenses, a false
>> representation, or actual fraud," we have held that a creditor
>> must show that 1) the debtor made a knowingly false
>> representation or one made in reckless disregard of the truth,
>> 2) the debtor intended to deceive, 3) the debtor intended to
>> induce the creditor to rely upon the false statement, 4) the
>> creditor actually relied upon the misrepresentation, 5) the
>> creditor's reliance was justifiable, and 6) the reliance upon the
>> false statement caused damage. Palmacci v. Umpierrez, 121
>> F.3d 781, 786 (1st Cir.1997). Though the first two elements of
>> the Palmacci test describe the conduct and scienter required to
>> show fraudulent conduct generally, the last four embody the
>> requirement that the claim of the creditor arguing
>> nondischargeability in an adversary proceeding must arise as
>> a direct result of the debtor's fraud.
>
> Spigel, 260 F.3d at 32 (footnotes omitted).

In re Woodford, 403 B.R. at 183-84 (footnote omitted).

In Woodford, this Court also discussed the decision of the United States Court of

Appeals for the Seventh Circuit in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000). *See*

*also* Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir.

2001)("actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations

and misleading omissions. . . . When a debtor intentionally engages in a scheme to deprive

or cheat another of property or a legal right, that debtor has engaged in actual fraud and

is not entitled to the fresh start provided by the Bankruptcy Code."); K-B Building Co. v.

Barber (In re Barber), 281 B.R. 617, 624 (Bankr. W.D. Pa. 2002); and Gentry v. Kovler (In re

Kovler), 249 B.R. 238, 260-61 (Bankr.S.D.N.Y.2000).  In Woodford, this Court observed:

> The Seventh Circuit began its analysis of applicable law under section
> 523(a)(2)(A) by noting that "[n]othing in the Supreme Court's opinion [in
> Field v. Mans, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ] suggests
> that misrepresentation is the only type of fraud that can give rise to a debt
> that is not dischargeable under section 523(a)(2)(A)." Id. It also observed that
> although most frauds do involve misrepresentations, section 523(a)(2)(A) is
> not limited to "fraudulent misrepresentations," id. at 893, adding that by
> distinguishing between "a false representation" and "actual fraud," the
> statute makes clear that "actual fraud is broader than misrepresentation." Id.
> (citing 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence
> P. King ed., 2000)) (section 523(a)(2)(A) defines "actual fraud" as "any deceit,
> artifice, trick, or design involving direct and active operation of the mind,
> used to circumvent and cheat another").

> The Seventh Circuit also stated that the type of conduct of which McClellan
> complained turned bankruptcy into "an engine for fraud" and that while
> exceptions to discharge should be construed narrowly, the exceptions do
> "serve vital functions," such as preventing fraud. Id. It thus determined:

>> Fraud is a generic term, which embraces all the multifarious
>> means which human ingenuity can devise and which are
>> resorted to by one individual to gain an advantage over

another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

Id. (citing Stapleton v. Holt, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla.1952)).

In re Woodford, 403 B.R. at 186.  This Court added:

The court in McClellan distinguished between actual and constructive frauds. It observed that "[t]o transfer property for less than adequate consideration may be desperate, foolish, or imprudent, and the receipt of such a transfer a pure windfall, . . . neither the transfer nor the receipt is in and of itself dishonest, and so neither is an appropriate ground for refusing to allow the debtor to discharge the debt arising from the transfer." McClellan, 217 F.3d at 894. It further explained the ramifications of the distinction:

> [W]hen a conveyance is merely constructively fraudulent, in the sense that having transferred the property that secured the debt without obtaining adequate consideration the debtor is now unable to pay his creditor, the transferee is not guilty of an actual fraud against the creditor and so the creditor cannot use section 523(a)(2)(A) to prevent the transferee from discharging the debt in bankruptcy. And so in this case, if though the debtor's brother intended to thwart McClellan and was thus committing actual fraud, his sister was innocent-if she had no intention of hindering any creditor-the debt that McClellan is seeking to collect from her would not have been obtained by her by actual fraud. But she is alleged to have been a full and equal participant in her brother's fraud, to have been in effect his accomplice, as in Cenco v. Seidman & Seidman, 686 F.2d 449, 452-453 (7th Cir. 1982). The debt that McClellan is seeking to collect from her (and prevent her from discharging) arises by operation of law from her fraud. That debt arose not when her brother borrowed money from McClellan but when she prevented McClellan from collecting from the brother the money the brother owed him.

Id. at 894-95.

Woodford, 403 B.R. at 185-86. The United States Court of Appeals for the First Circuit has

neither adopted nor rejected the McClellan formulation. It stated:

> Though there are differences between McClellan and Palmacci - the most
> significant of which concerns whether reliance is required - we do not decide
> whether we would adopt the Seventh Circuit's reasoning. McClellan is
> consistent with our existing precedent in that it also requires a *direct link*
> between the alleged fraud and the creation of the debt.

Spigel, 260 F.3d at 32 n. 7 (emphasis supplied).

While the First Circuit has focused its test on the "false representation" component

of section 523(a)(2)(A), and the Seventh Circuit formulated a different approach for the

"actual fraud" component, other courts have fashioned a slightly different test for the

"false pretenses" component. For example, in Ostertag v. Overall (In re Overall), 248 B.R.

146 (Bankr. W.D. Mo. 2000), the court observed:

> The concept of false pretenses is especially broad. It includes any intentional
> fraud or deceit practiced by whatever method in whatever manner. False
> pretenses "may be implied from conduct or may consist of concealment or
> non-disclosure where there is a duty to speak, and may consist of any acts
> intended to deceive." Black's Law Dictionary 602 (6th ed.1990). It is a "series
> of events, activities, or communications which, when considered collectively,
> create a false and misleading set of circumstances, or a false and misleading
> understanding of a transaction, by which a creditor is wrongly induced by
> a debtor to transfer property or extend credit to the debtor." Sterna v.
> Paneras (In re Paneras), 195 B.R. 395, 406 (Bankr. N.D. Ill.1996). Silence or
> concealment as to a material fact can constitute false pretenses. Bank of
> Miami v. Quintana (In re Quintana), 4 B.R. 508, 510 (Bankr .S.D. Fla.1980). In
> short, false pretenses "can be made in any of the ways in which ideas can be
> communicated." First Nat. Bank of Webster v. Aetna Cas. & Sur. Co., 256
> F.Supp. 266, 272 (D. Mass.1966).

In re Overall, 248 B.R. at 150 (footnote omitted). In First Nat'l Bank of Webster v. Aetna

Cas. & Sur. Co., a case referenced by the Missouri bankruptcy court, the United States

District Court for the District of Massachusetts stated:

> "to constitute the crime of larceny by false pretenses (G.L. c. 266 § 30), it must appear that there was a false statement of fact known or believed by the defendant to be false made [sic] with the intent that the person to whom it was made should rely upon its truth and that such person did rely upon it as true and parted with personal property as a result of such reliance." 256 F.Supp. at 272 (citing  Commonwealth v. Louis Construction Co., 343 Mass. 600, 604 (1962)).

First Nat'l Bank of Webster, 256 F.Supp. at 272.  The court added: "According to Mass .G.L. c. 277, § 39, false pretenses can be made by acts as well as words. They may in fact be made in any of the ways in which ideas may be communicated. A misrepresentation as to a person's present intention may be a false pretense." 256 F.Supp. at 272 (citing Commonwealth v. Morrison, 252 Mass. 116, 122, (1925), and Commonwealth v. Walker, 108 Mass. 309, 312 (1871)).

In U.S. v. Hampton (In re Hampton), 396 B.R. 28 (Bankr. N.D. Iowa 2008), a case in which the debtor received unemployment benefits to which she was not entitled, the court, citing Caspers v. Van Horne (In re Van Horne), 872 F.2d 1285 1288 (8th Cir. 1987), *abrogated on other grounds by* Grogan v. Garner, 498 U.S. 279 (1991), stated:

> "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A). Clearly, the Bankruptcy Code did not intend to protect property obtained by 'deceit, artifice, trick [or] design.' " Van Horne, 823 F.2d at 1288 (citations omitted). For purposes of § 523(a)(2)(A), a "misrepresentation" denotes not only written or spoken words but also any other conduct that amounts to an assertion not in accordance with the truth. In re Moen, 238 B.R. 785, 791 (8th Cir. BAP 1999). "False pretenses" contemplates "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the

14

debtor." In re Beza, 310 B.R. 432, 437 (Bankr. W.D. Mo. 2004).

In re Hampton, 396 B.R. at 30.

Although this Court has cited numerous cases with varying permutations of the First Circuit's articulation of the elements required to establish a claim under 11 U.S.C. § 5233(a)(2)(A), this Court simply cannot find, based upon the existing record, that the Debtor obtained money from Youssef by false pretenses, false representations or actual fraud. Under any of the tests referenced above, section 523(a)(2)(A) requires proof of scienter, and Youssef did not sustain his burden of proof with respect to that element. As the court in Wolf v. McGuire (In re McGuire), 248 B.R. 481 (Bankr. D. Colo. 2002), recognized, "regardless of whether they adopt different definitions or tests for the three operative terms, courts uniformly require proof of the elements of scienter and justifiable reliance in order to establish any of the three possible claims under Section 523(a)(2)(A)." 284 B.R. at 490. According to the court in McGuire,

> The fraudulent intent element of § 523(a)(2)(A) . . . may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances "presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides *an indication of the debtor's state of mind at the time of the actionable representations*.

Id. at 492 n. 32 (emphasis supplied)(quoting Groetken v. Davis (In re Davis), 246 B.R. 646, 652 (B.A.P. 10th Cir. BAP 2000), *aff'd in part and vacated in part by* 35 Fed.Appx. 826 (10th Cir. 2002)).

Under any of the formulations set forth above, and based upon the evidence

15

presented, this Court finds that Youssef failed to satisfy the two critical elements of scienter and justifiable reliance, both with respect to his initial $15,000 deposit and subsequent payments.  In other words, the Court has insufficient evidence from which it can conclude that Fogarty had no intention of employing licensed subcontractors at the time the contract was executed or otherwise completing the contract in accordance with its terms.  Indeed, the Court has no evidence of specific representations, false or otherwise, that were different from the contract terms, and "[g]enerally, a promise of future results 'cannot be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made.'" Vinson v. Cozart, 417 B.R. 116, 128 (Bankr. W.D. Ark. 2009)(quoting Miller v. Premier Corp., 608 F.2d 973, 981 (4th Cir.1979)).

Not only did Youssef fail to call Fogarty as a witness,[3] Youssef failed to testify or elicit testimony from others from which this Court could either find that misrepresentations were made by the Debtor or Lavelle, or infer that, at the time Lavelle and Youssef executed the contract, Fogarty had no intention or ability to successfully complete the contract.  Indeed, the Court has no evidence whether Fogarty was, or was not, a licensed contractor, and whether he or his company was insured.  In addition, although Lavelle, as Fogarty's agent for purposes of procuring construction contracts, gave Youssef the false impression that he was Fogarty's partner, Youssef did not call Lavelle as a witness for purposes of eliciting testimony from him about his specific statements to Youssef prior

---

[3] As noted, the Court called Fogarty for the limited purpose of ascertaining his business relationship with Lavelle.

16

to the  execution of the contract.

In addition, Youssef did not produce evidence from which this Court could infer that the Debtor did not intend to perform the contract in accordance with any representations made by Lavelle or to abide by any of its terms at its inception. For example, Youssef did not call as witnesses the heavy equipment operator or David Ryan who did carpentry work for Fogarty Construction as subcontractors.  The Court was presented with no evidence as to the number and experience of the Debtor's employees, if any, and whether Fogarty Construction regularly engaged the heavy equipment operator or David Ryan or other subcontractors to perform contracts procured by Lavelle.  Had the Court been presented with evidence that Fogarty routinely used unlicensed subcontractors, and, in particular, engaged Ryan for other jobs, this Court could infer that he did not intend, at the outset, to use only licensed subcontractors or notify Youssef that he was engaging subcontractors so that Youssef could assess their qualifications.

The Court also was presented with no evidence as to the Debtor's financial condition.  If the Debtor had financial difficulties at the time Youssef executed the contract, it would be plausible for this Court to infer that he utilized cheap, unlicensed, and inexperienced laborers to perform tasks that would have been more costly if performed by licensed and experienced subcontractors, thereby maximizing his profits.  The Court also was presented with no evidence to suggest that the Debtor had more work than he was in a position to perform or that Fogarty Construction, contrary to Lavelle's representation that it had built houses that came out well, had built houses that were defective.  The Court

17

was presented with no evidence of other disgruntled customers or complaints filed against Fogarty Construction.  Youssef did not call the Debtor or Lavelle to inquire about other home owners who may have been victimized by the incompetence of Fogarty Construction employees or subcontractors, licensed or otherwise.[4]

In addition to the absence of evidence as to misrepresentations made by Fogarty with the intent to deceive, the Court finds Youssef relied, at least in part, on the recommendation of a builder from Hingham, David Chase, in selecting Fogarty Construction rather than on any particular representations made by Fogarty or Lavelle. The Debtor did not even meet Fogarty until late April when demolition began at the property.  Under these circumstances, the Court finds that Youssef failed to satisfy critical elements of his burden of proof under section 11 U.S.C. § 523(a)(2)(A), namely scienter and justifiable reliance.

Moreover, after the initial deposit of $15,000, Youssef did not establish justifiable reliance for any subsequent payments.  Youssef was present when the existing home was demolished and at that time knew of Fogarty Construction's unreliability and poor work performance.  Indeed, the poor performance became a public hazard necessitating the involvement of local officials.  The demolition work resulted in damage to the foundation, and Youssef's concerns were brushed aside by Fogarty.  The demolition work presented

---

[4] The Court observes that the failure of counsel to the Plaintiff to call the Debtor, who was present in the courtroom, to the stand, and the failure to subpoena and call Lavelle as a witness during the trial, may have adversely affected the outcome of the Plaintiff's case.

18

a "red flag" as to future problems.  Of course, hindsight is always 20/20, but after the

demolition fiasco, Youssef could not justifiably rely on any representations made by

Fogarty.

      B.  Count II - -Section 523(a)(6)

      In Kawaauhau v. Geiger, 523 U.S. 57 (1998), a unanimous Supreme Court performed

the following analysis:

> We confront this pivotal question concerning the scope of the "willful and
> malicious injury" exception: Does § 523(a)(6)'s compass cover acts, done
> intentionally, that cause injury . . ., or only acts done with the actual intent to
> cause injury . . .? The words of the statute strongly support the [latter]
> reading.
>
> The word "willful" in (a)(6) modifies the word "injury," indicating that
> nondischargeability takes a deliberate or intentional *injury*, not merely a
> deliberate or intentional act that leads to injury. Had Congress meant to
> exempt debts resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury." Or, Congress might have
> selected an additional word or words, i.e., "reckless" or "negligent," to
> modify "injury." Moreover, . . . the (a)(6) formulation triggers in the lawyer's
> mind the category "intentional torts," as distinguished from negligent or
> reckless torts. Intentional torts generally require that the actor intend "the
> *consequences* of an act," not simply "the act itself." Restatement (Second) of
> Torts § 8A, comment a, p. 15 (1964) (emphasis added).

Id. at 61-62 (footnote omitted, emphasis in original). The Court held that, "debts arising

from recklessly or negligently inflicted injuries do not fall within the compass of §

523(a)(6)." Id. at 64.

      Geiger involved an incident of medical malpractice and a malpractice judgment, but

the Court's holding is germane to the second count of Youssef's Complaint.  In order to

prevail on that count Youssef had to present evidence, not that Fogarty's actions were

19

voluntary or intentional, but that he intended to injure the property.

The Court finds that Youssef failed in his burden of proof, but he is not alone in his attempt to establish willful and malicious injury by a construction contractor. *See, e.g.*, Vinson v. Cozart (In re Cozart), 417 B.R. 116, 130-31 (Bankr. W.D. Ark. 2009); Prewett v. Iberg (In re Iberg), 395 B.R. 83 (Bankr. E.D. Ark. 2008); In re Rapp, 375 B.R. 421, 436-37 (Bankr. S.D. Ohio 2007). In Iberg, the court observed:

> A dischargeability determination under § 523(a)(6) has been considered in the context of home construction contracts. [Vaughn v. Quinn (In re] Quinn[)], 180 B.R. [550]at 552-54 [(Bankr E.D. Mo. 1995)] (citing Vaughn v. Quinn (In re Quinn), 170 B.R. 1013 (Bankr. E.D. Mo. 1994)) (finding that although the debtor breached a construction contract by rendering poor workmanship on the roof of the house as well as other areas-using low quality paint, installing a crawl space access door backwards, venting a sink vent improperly, and completing certain plumbing work improperly resulting in the flooding of the basement-the debtor's actions did not rise to the level of malice required to find the creditor's judgment nondischargeable); Stevens v. Anconeous (In re Anconeous), 358 B.R. 172, 187 (Bankr. E.D. Pa. 2006) (citations omitted) (finding that the negligent performance of a home repair contract fell outside the scope of § 523(a)(6)); Rezin v. Barr (In re Barr), 194 B.R. 1009, 1024 (Bankr. N.D. Ill. 1996) (concluding that plaintiffs' failure to present sufficient evidence that the debtor intended to build the house with defects warranted a finding of dischargeability even though the debtor was "obviously negligent in building the [p]roperty and breached the contract and building code in many ways.").

395 B.R. at 92. Like the cases cited above, the Court finds that Youssef failed to establish a willful and malicious injury. There was simply no evidence that Fogarty intended or desired to damage the property or Youssef. Because section 523(a)(6) contemplates an intentional tort, which requires the actor to intend the consequences of the act, rather than an intentional act with unintended consequences, Geiger 523 U.S. at 62, a breach of

20

contract, no matter how extensive and egregious, is not the type of injury addressed by section 523(a)(6).

Having determined that Youssef failed in his burden of proof under the preponderance of the evidence standard set forth in <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991), the Court is compelled to observe that it has no doubt that Fogarty's breaches of the construction contract was extensive, egregious, and inexcusable and that his building practices, if routinely employed, pose a menace to unsuspecting customers.  Had Youssef been able to proceed against the Debtor in state court, he would likely have succeeded on a claim under Mass. Gen. Laws ch. 93A.  The exceptions to discharge under 11 U.S.C. § 523(c), however, have different elements than claims under ch. 93A, which Youssef failed to satisfy.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter judgment in favor of the Debtor and against Youssef.  The Motion for a Directed Verdict is moot.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: March 10, 2010
cc: Stephen K. Midgley, Esq., Audrey Botros, Esq.

22